**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

CITY OF DETROIT,

    Plaintiff,

v.                                                  Case No. 03-CV-74279-DT

TXU ENERGY RETAIL COMPANY L.P. f/k/a
TXU ENERGY SERVICES and SEMINOLE
ENERGY SERVICES,

    Defendants.
                                  /

**FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO
FED. R. CIV. P. 52 ON DEFENDANTS' CLAIM FOR REFORMATION OF CONTRACT**

On August 4, 2004, Plaintiff City of Detroit ("City") filed a "Motion for Summary Judgment" in the above-captioned case. Defendant TXU Energy Retail Company L.P. f/k/a TXU Energy Services ("TXU") and Defendant Seminole Energy Services ("Seminole") filed responses to the City's motion on October 20, 2004. The City filed a reply to Seminole's response on October 27, 2004 and filed a reply to TXU's response on November 1, 2004.

The court held a hearing in this matter on December 8, 2004. During that hearing, the parties and the court agreed that the equitable issue in the case should be decided by the court before further argument was heard relating to Plaintiff's "Motion for Summary Judgment." On January 24, 2005, the court issued a "Second Amended Scheduling Order," which set a bench trial for April 25, 2005. This bench trial was held from April 25, 2005 - April 27, 2005. For the reasons set forth below, the court finds, by

clear and convincing evidence, in favor of Defendants TXU and Seminole's argument that the contract must be reformed.

## I.  BACKGROUND

TXU and Seminole agree that they are responsible for the cost of transporting gas under the contract to the Detroit "Citygates," which are identifiable physical places in the infrastructure of natural gas transmission lines, but the parties dispute whether TXU and Seminole are responsible for paying the "MichCon transportation costs."  The City contends that Defendants are liable for the cost of transportation assessed by the Michigan Consolidated Gas Company, a Michigan-regulated utility, to push the gas beyond the Citygates through MichCon gas transmission lines within Detroit to the various City "burner tips," that is, the points at which the gas is ultimately used.

## II.  STANDARD

It is well-established that under Michigan law:

> A written instrument may be reformed where it fails to express the intentions of the parties thereto as the result of accident, inadvertence, mistake, fraud, or inequitable conduct, or both fraud and mistake, fraud or inequitable conduct being on one side and mistake on the other.  Conversely, in the absence of satisfactory proof of accident, fraud, or mistake, there is no basis for a court of equity to reform an instrument.

*Najor v. Wayne Nat'l Life Ins. Co.*, 178 N.W.2d 504, 511 (Mich. Ct. App. 1970) (citing 45 Am. Jur., Reformation of Instruments, § 45.)  In addition:

> [T]o justify the reformation of a written contract upon the ground of mistake the alleged mistake must be one of substance and of fact, and not of law; that such mistake must be proved by clear and entirely satisfactory evidence, and that a mere preponderance of evidence is not sufficient; that the mistake must be mutual and common to both parties to the instrument.

*Burns v. Caskey*, 58 N.W. 642, 644 (Mich. 1894).

In determining whether a mutual mistake exists, the court must discern the intent of the parties at the time that they reduced their agreement to writing. 66 Am. Jur. 2d, Reformation of Instruments, § 21.

> "Parol evidence is sufficient to warrant the reformation of a written instrument." (citing *Moss v. Van Wagnen*, 228 N.W. 696, 697 (Mich. 1930)). The theory of this rule is well stated in 23 R.C.L. § 66, p. 366, as follows: "It is practically a universal rule that in suits to reform written instruments on the ground of fraud or mutual mistake, parol evidence is always admissible to establish the fact of fraud or of a mistake and in what it consisted, and to show how the writing should be corrected in order to conform to the agreement or intention which the parties actually made or had. This doctrine impinges on and limits the salutary rule of law against the admission of parol evidence to vary a written contract, but experience has clearly shown this to be necessary; otherwise a rule adopted by the courts as a protection against fraud and false swearing would, as was said in regard to the analogous rule known as the statute of frauds, become the instrument of the very fraud it was intended to prevent. Evidence of fraud or mistake is seldom found in the instrument itself, from which it follows that unless parol evidence may be admitted for that purpose, the aggrieved party would have as little hope of redress in a court of equity as in a court of law."

*Goldberg v. Cities Service Oil Co.*, 266 N.W. 321, 325 (Mich. 1936).

"The burden of proof is upon the party seeking reformation to present clear and convincing evidence that the contract should be reformed in order to carry out the true agreement of the parties." *Dingeman v. Reffitt,* 393 N.W.2d 632, 636 (Mich. Ct. App. 1986)*; see also E.R. Brenner Co. v. Brooker Engineering Co.*, 4 N.W.2d 71, 73 (Mich. 1942).

### III.  TXU's and Seminole's Arguments

TXU avers that it "never intended to be responsible for MichCon transportation costs" under its contract with the City. (TXU's Br. at 9.) TXU contends, further, that TXU "has never entered into a contract in Michigan that did not provide for delivery of

3

gas to the Citygate with all transportation costs assumed by the client." (*Id.*)  Instead, TXU claims that "the parties agreed that the City would be responsible for all costs associated with the transportation of natural gas sold pursuant to the Contract from the Michcon Citygate to the burner tip." (*Id.* at 7.)  Finally, TXU argues that "[t]o the extent that this agreement is not reflected in the Contract, the [c]ourt should reform it." (*Id.*)

In a similar vein, Seminole argues that "Exhibit 'A' of the Contract contains a material mistake that does not reflect the agreement and intent of the parties with respect to Seller's obligations for payment of the transportation of gas." (Seminole's Br. at 23.)  Seminole asserts that "[w]ithout question, the parties' intent at the time the Contract was executed was for the Delivery Point to be the MichCon Citygate." (*Id.* at 24.)  Seminole argues further that "[r]egardless of the understanding of any individual associated with the City, no other person or entity had the decision-making power of the City Council. . . .  At the time of the Contract's execution and at all times throughout the Contract term, the City Council demonstrated its intent that the Delivery Point be the Michcon Citygate." (*Id.* at 24-25.)  Moreover, Seminole argues that "the City Council had no knowledge that the Contract Delivery Point was anything but the MichCon Citygate at the time it approved the Contract.  Thus, it would have been impossible for the City Council to formulate the requisite intent to agree to a Delivery Point at the Facilities." (*Id.* at 25.)  Seminole also points out that "the City Council . . . approv[ed] separate and distinct contracts with MichCon for the payment of delivery of gas from the Citygate to the Facilities." (*Id.*)

4

### IV.  The City's Arguments

The City argues that Defendants are contractually bound to pay its transportation costs because "the Contract unambiguously provides that it constitutes the *entire* and *final* agreement of the parties and cannot be contradicted by prior negotiations or agreements." (Pl.'s Br. at 5.) (Emphasis supplied.)  The City relies on the plain language of the contract, contending that "[b]ecause [the] contract unambiguously specified that the seller was to pay the cost of transportation to the facilities meter, that was the City's declared intent.  Thus, there is no mutual mistake." (*Id.* at 11.)  In addition, the City denies that it waived its "right to claim entitlement to the transportation costs" due to the City's failure to "catch[ ] the mistake in the first three years of the contract." (*Id.* at 7.)  The City maintains that "where the parties have entered into an unambiguous written contract that contains a[n] 'anti-waiver' provision contrary to the subsequent interpretation and explicit language prohibiting waiver, the court sets a very high standard on the proponent of such a waiver argument." (*Id.*)

### V.  Findings of Fact and Conclusions of Law

#### A.  Findings of Fact

The court, in rendering these findings of fact, has endeavored to study and evaluate the credibility of the witnesses and other evidence pursuant to its responsibility under Fed. R. Civ. P. 52(a).  To the extent that the court finds a fact or draws an inference derived from a matter that was or could have been contested or as to which there exists conflicting evidence, the court has credited the version of the testimony or other evidence in support of that fact or inference and rejected as less convincing any

5

testimony or evidence to the contrary, even if the court has not specifically so stated in association with each specific finding.

### 1. Party Relationships and Standing

1) Sometime after May 1, 2000, TXU became a successor in interest to TXU Energy Services's rights and obligations under the Contract. (*See* Stipulated Facts at ¶15.)

2) On or about April 1, 2003, Seminole succeeded to TXU's rights and duties under the contract at issue in this case. (Trial Ex. 569; Stipulated Facts at ¶16.)

3) Seminole, as successor in interest to the contract from TXU, is the proper party in interest to pursue any and all relief requested herein by Seminole. (Trial Ex. 569; Stipulated Facts at ¶16.)

### 2. Background Facts Relating to the Parties' Past Dealings

4) In 1988, the City entered into a five year gas supply contract with Consolidated Fuel Corporation that was renewed in 1993 pursuant to a renewal option in the contract. (Trial Exs. 101, 102, and 547.)

5) Consolidated Fuel Corporation never assumed liability for MichCon transportation charges, though it may have on occasion paid MichCon transportation invoices and then charged the City for such payment in addition to the price of the natural gas commodity. (Trial Tr. Vol. I, pp. 136-39 [Testimony of Mr. Patrick Napolitan, former manager of Consolidated Fuel Corporation who handled the everyday operations of the company and participated in negotiating the Contract.])

6) The City's two prior long term gas supply contracts, dating back to 1988, required the seller to deliver gas to the Citygate of the City's local distribution company ("Citygate"), Michigan Consolidated Gas Company ("MichCon") and not to the meters (or "burner tips") of each of the City's individual facilities that were to receive the gas (the "Facilities"). (*See* Trial Exs. 568, 527, 509, and 547.)

7) In 1998, the Detroit City Council attempted to disavow the third extension of the contract agreed to by Mark Petty, former director of the Public Lighting Department. Enserch Energy Corp. ("Enserch"), Consolidated Fuel Corporation's successor-in-interest with respect to the 1988 contract, disputed the enforceability of the City Council's position. To resolve their dispute, the parties mutually agreed that the City would offer a new gas contract for competitive bidding. (*See* Trial Tr. Vol. 1, pp. 87-88; Vol. II, pp. 287-88 [Testimony of Mr. Jeff Weiser, President of Growth Point (a consulting firm) and

former senior vice president of marketing for TXU]).

8)      During the period in which a new gas contract was offered for competitive bidding, Enserch and the City agreed to a six month agreement for the sale of natural gas to the City at market rates delivered to the Citygate.  (*See* Trial Ex. 586.)

### 3. Evidence Relating to the Parties' Intent at the Time that the Contract Was Formulated

9)      In December 1999, the City issued a Request for Proposals (the "RFP"), seeking bids from vendors to supply gas to multiple City facilities.  As set forth in the terms of the RFP, the City intended that the seller's "delivery point" for the gas be the MichCon Citygate; the RFP did not contemplate or request that the Facilities be seller's "delivery point" for the gas to be provided under the proposed gas contract.  (*See* Stipulated Facts at ¶1; Trial Exs. 545, 546, 543, and 501.)

10)    The RFP stated: "The Buyer is seeking a qualified supplier of natural gas for its natural gas transportation accounts."  (Trial Ex. 545, p. 1 of 23.)

11)    Section 4.0 (B) of the RFP (Seller Managerial and Operation Responsibilities) contained the following statements:

    1.  Seller shall deliver non-recallable firm gas supply to Buyer on a full requirement basis, and ensure firm transportation to Buyer's facilities.
    2.  Seller shall schedule and make all nominations of gas supply.
    3.  Seller shall review and reconcile LDC invoices for accuracy.
    4.  Seller shall assume all financial responsibility for (1) all transportation imbalance penalties and any other charges and/or penalties incurred in transporting gas to the delivery point; and (2) all penalties and or charges imposed on Buyer by LDC regarding unauthorized use of excess storage.
    5.  Seller shall manage all interstate pipeline transportation capacity to enable firm delivery of gas to delivery point.

                                          ***

    6.  Respondents are encouraged to include supporting or ancillary services that may distinguish their firm.

(Trial Ex. 545, Sec. 4.0.)

12)    The RFP also included the "Natural Gas Price Requirements" and "Natural Gas Bidding Parameters."  The "Natural Gas Bidding Parameters" included the statement:

> The Seller's bid shall be binding for up to one hundred twenty (120) business days, until a Notice of Intent to award is rendered by the Buyer. Furthermore, Seller assumes all risk and liabilities for gas purchase price until a binding contract is approved by City Council.

(Trial Ex. 545, Sec. 5.0 (B).)

13) The RFP also contained a form gas contract that the parties used as the basis for contract negotiations. (*See* Stipulated Facts at ¶2; Trial Ex. 545.)

14) In particular, the RFP stated that "[t]he Contract will be awarded to the bidder based primarily on gas price and gas purchase structure. The City of Detroit will consider the following criteria in evaluating proposals submitted in response to this RFP: Cost, Administrative Services, Financial Strength, Performance History, Incentives which may be offered by bidder (e.g. reimbursement for pipeline discounts or reduced gas cost)."

(Trial Ex. 545, Sec. 7.0.)

15) The RFP further stated that: "A Natural Gas Delivery Contract will be awarded to the successful bidder." (Trial Ex. 545, Sec. 7.0.)

16) The RFP also stated that "A Natural Gas Delivery Contract is attached for review. Some or all of the provisions may be included in the contract that will result from this RFP." (Trial Ex. 545, Sec. 9.0.)

17) The "sample" contract included the following provisions:

> The term "Delivery Point(s)" as used herein means the mutually-agreed point(s) of delivery pursuant to a Transaction Agreement. Seller [shall] arrange and pay for all transportation necessary to transport gas to the Delivery Points (s). Buyer shall pay for all transportation necessary to transport gas from the Delivery Point(s).

(Trial Ex. 545; p. 15 of 23.)

18) The RFP also included "EXHIBIT 'A' SCOPE OF SERVICES," which contained the heading "DELIVERY POINT": with a blank space following it.

(Trial Ex. 545, p. 25 of 23.)

19) The bid from TXU included the following "Supporting and Ancillary Services Included in the Offer from CNR, Infinity, and TXUES":

8

> 1.  Actual Usage (Burnertip) Billing – The partnership will bill the City on its actual usage and not a city-gate or nominated estimate.
>
> \* \* \*
>
> 2.  Single Billing – The partnership will consolidate all supply transport and distribution bills into a single easy to read invoice.
>
> The advantages are:
> Ease of tracking costs.
> Only one check to process.
> Fewer resources required to gather, process, and pay invoices.
> Lowers the total transaction costs.
> Eliminates late payment charges.

(Trial Ex. 541, Sem Energy/COD 0256.)

20) Certain City personnel were nominated to serve on the Mayor's Energy Task Force a/k/a the Energy Committee, charged with the task of *inter alia*, reviewing the RFP and vendor responses, as well as other energy-related issues including discussion of the terms of the Contract and transportation contracts with MichCon (the "MichCon Contracts").  The evaluation committee for the RFP responses was comprised of Scott Hamilton, Mark Petty, George Cascos, Tom Cattron, and Juan Martinez.  (*See* Stipulated Facts at ¶4; Trial Exs. 511, 504, 510, 515.)

21) TXU was selected as the most responsive and economical choice based on "Price, Performance History, Ancillary Services, References, and Financial Strength/Viability."  (Trial Ex. 104.)

22) After TXU was selected to negotiate a gas contract between it and the City, the two entities began finalizing the contract details for submission to the City Council for approval.  (*Id.*)

23) Petty, as director of the Public Lighting Department, supervised Hamilton, who was the energy consultant for the City.  Hamilton was the only City representative/negotiator of the business terms of the gas contract with TXU, including contract price.  *(See* Stipulated Facts at ¶7; Trial Exs. 502, 567.)

24) During the contract negotiations, the City required various changes to the form contract to ensure that the City paid only for gas consumed by the Facilities and not for gas scheduled and delivered as originally set forth in the form contract. For example, Section 13 of the Contract ("BILLING AND PAYMENT") originally provided as follows:

> Seller shall provide Buyer with a written statement setting forth the

actual volumes of gas scheduled and delivered for the month. Billing and payment shall be based on actual scheduled quantities of gas delivered and sold to Buyer at the Delivery Point(s).

25) The City made the following revisions to Section 13:

Seller shall provide Buyer with a written statement setting forth the actual volumes of gas <u>consumed</u><s>scheduled and delivered</s> for the month. Billing and payment shall be based on actual <s>scheduled</s> <u>consumed</u> quantities of gas delivered and sold to Buyer at the <u>burner tip</u><s>Delivery Point(s)</s>.

(*See* Stipulated Facts at ¶14; Trial Ex. 550.)

26) In total, between the selection of TXU and approval by the City Council, several draft versions of the Contract were exchanged between the City and TXU. (Trial Ex. 550.)

27) The subject of TXU providing administrative services in the form of a single invoice for the gas and the City's transportation costs was discussed during the negotiation of the gas contract between the City and TXU. (*See* Trial Exs. 501, 502; Trial Tr. Vol. I at 53-54. [Testimony of Jeff Weiser].)

28) A memorandum from Renita Johnson, the in-house counsel for the City who was involved in reviewing the gas contract relating to legal issues, estimated that the City would save $450,000 from this invoicing system. In her deposition, Ms. Johnson acknowledged that her reference to TXU's administrative services in her memorandum did not reflect an understanding that TXU had agreed to be liable for the MichCon transportation charges. (*See* Trial Exs. 502, 501 v.1 at 38:12-16, 124:11-14, 143:4-144:3, v.2 at 5:11-25, 6:1-25, 7:1-25, 8:1-25, 9:1-25, 10:1-25, 11:1-25, 12:1-6.)

29) The administrative services discussed by the parties during the negotiation of the gas contract never included the assumption by TXU of liability for the MichCon transportation charges related to the transportation of natural gas from the Citygate to the burner tips. (Trial Exs. 554, 501.)

30) The contract provided that the seller shall arrange and pay for all transportation necessary to transport gas to the Delivery Point(s) defined as "Each facility's meter(s) as attached in Exhibit 'C.'" (*See* Trial Ex. 544.) Exhibit A was incomplete and Exhibits "B" and "C" were blank when the contract was executed on April 20, 2000. (Trial Tr. Vol. I, pp. 63-65 [Testimony of Jeff Weiser].)

31) The administrative services were not accepted by the City, were not included in the contract, and were never implemented in practice by the parties. (Trial Ex. 544.)

32) The contract provides that neither party will be deemed to have waived any of its rights under the contract unless the waiver is in writing and signed by the party. (Trial Ex. 544 at ¶25.)

33) At all times prior to the agreement of the parties on a gas price, TXU's bid price of $2.87/mcf was subject to change based on the movement of gas prices in the gas market, until approval of the negotiated gas contract by the City Council. Hamilton and Petty were aware of the potential movement of TXU's price at all times until the approval of the Contract by the City Council on April 26, 2000. (*See* Stipulated Facts at ¶6; *See* Trial Exs. 567, 519, 521, 541, 542; Trial Tr. Vol. I, 45-47; 61-62 [Testimony of Jeff Weiser].)

34) Both Hamilton and Petty knew that the MichCon transportation charges for the Facilities were approximately $0.54/MMBTU during the negotiation of the Contract and at the time the Contract was executed. (*See* Stipulated Facts at ¶20.)

35) The interpretation of the Contract as a "burner tip delivery point" contract is inconsistent with provisions of natural gas purchase contracts as they are typically used in the natural gas industry. (Trial Tr. Vol. I, pp. 60-61 [Testimony of Jeff Weiser].)

36) Ultimately, the parties agreed on a price of $3.45/MMBTU. (*See* Trial Ex. 544.) The change in the price from $2.87/mcf to $3.45/MMBTU was based primarily on the movement of gas prices in the market, or changes in the NYMEX index. The components of the price were $3.02/MMBTU for the gas (market price at the time), $0.13/MMBTU for the purchase of an "option" hedge allowing the City to "participate" in declines in market price, and a transfer price margin of $0.30/MMBTU. (*See* Trial Ex. 553.)

37) The subject of TXU offering to assume payment liability for the MichCon transportation charges was never discussed or mentioned by representatives of TXU to Hamilton, Petty, or any other City representative during the negotiations of the gas contract or any other time. (*See* Trial Exs. 504 at 123:1-6; 515 at 37:16-20; 520 at 58:20-25, 59:18-60:2, 60:5-6, 60:24-61:5, 66:12-25, 67:3-4, 67:6-10, 67:13-14; 525 at 76:18-77:3, 77:21-24, 78:24-79:3; 549, 554, 557.)

38) Hamilton did not discuss the issue of TXU paying the MichCon transportation charges with any City representative during the negotiations of the gas contract or any other time prior to April 2003. (*See* Trial Ex. 577.)

39) Hamilton advised Petty and Johnson of the status of negotiations and reviewed and revised the final contract.  (*Id.*)

40) A Contract price of $3.45 that included MichCon transportation charges would have produced a loss of $0.24/MMBTU for every MMBTU of gas sold under the Contract.  (Trial Tr. Vol. 1, p. 74 [Testimony of Jeff Weiser].)

41) On April 10, 2000, Ken Blenk, TXU's Manager of Deal Optimization, informed Scott Hamilton that the delivered cost of gas to the City, if it purchased the natural gas commodity from TXU, would be $3.77/mcf, the sum of the commodity price plus MichCon transportation charges.  (*See* Trial Ex. 566.)

42) TXU's internal abstract of the Contract and the Confirmation Ticket of TXU's purchase of gas from CoEnergy Trading Company to supply the requirements of the Contract identify the Delivery Point of the Contract as the MichCon Citygate.  (*See* Trial Exs. 549, 557.)

43) On May 31, 2000, Hamilton presented members of the Energy Committee an update on the status of the Contract.  Hamilton informed the Energy Committee that the Contract had been signed at a cost of $3.45/mcf, which included the cost of transportation to the MichCon Citygate delivery point and a NYMEX price of $3.14/mcf.  Hamilton also informed the Energy Committee that the City was responsible to MichCon for approximately an additional $0.53 local delivery charge through a contemporaneously extended MichCon Contract, resulting in a total natural gas price of $3.97/mcf.  (*See* Trial Exs. 507; 508; 504 at 40:14-41:4, 113:18-20, 115:17-24, 124:4-125:16; 510 at 41:11-42:2, 44:4-20, 50:14-52:24; 538 at 33:7-20, 34:19-35:3.)

44) In his communications with various City employees on at least eight separate occasions between August 2000 and October 2002, Hamilton described the cost of the Contract (as defined below) as $3.45 for gas and noted a separate $0.54 charge to MichCon for the transportation of the gas to the Facilities.  These employees included Kathie Dones-Carson (Research and Analysis Department), Angela Brown Wilson (head of Energy Committee), Irvin Corley (Finance Department), Juan Martinez (Mayor's office), Geralda McCarthy (Mayor's liaison to City Council), Renita Johnson (Legal), Laurie Hohwart (Legal), Ronald Wiggins (Mistersky power plant manager), David Graham (Mistersky power plant engineer), LeRoy Barnes, Daniel Woitulewicz (Public Lighting Department), James Coon (Mistersky power plant employee), Marilyn Moore, Narayanaswamy Sethuram (Mistersky power plant engineer), Audrey Jackson (Purchasing Department), and Sean Werdlow, among others.  Petty was also included in Hamilton's discussions.  (*See* Trial Exs. 578; 575; 539; 535; 536; 533; 572; 573; 580; 581; 537; 532 at 41:6-16; 523; 522 at 22:21-24:22, 34:6-12; 525 at 104:5-16, 108:3-25.)

45) In 2001, David Graham forwarded information to Scott Hamilton indicating that the City was responsible for MichCon transportation charges in addition to the Contract price.  (*See* Trial Exs. 535; 536; 532 at 20:1-16, 21:4-6, 22:13-15, 23:18-24:21, 25:15-27:18, 38:10-15, 39:3-41:1, 50:1-52:22, 53:13-54:6, 60:5-20, 102:4-13.)

46) Although Petty had authority to sign a gas contract on the City's behalf, he had no authority to bind the City to the terms of a gas contract until its terms had been reviewed and approved by the City Council.  (*See* Stipulated Facts at ¶8; Trial Ex. 521.)

47) Various City departments were required to review the terms of the proposed gas contract for the purpose of preparing reports for the City Council or otherwise recommending the approval of the proposed gas contract, including the Research and Analysis Department, the General Auditor's Department, the Finance Department and members of the Mayor's office.  (*See* Stipulated Facts at ¶9; Trial Exs. 519, 517, 521, 516, 520, 522.)

48) None of the reports or recommendations ever provided to the City Council regarding the Contract mentioned that TXU would be liable for MichCon transportation charges.  (*See* Trial Exs. 517; 521; 520 at 30:5-22; 522 at 52:14-20; 516 at 49:25-51:10.37.)

49) On or about April 20, 2000, TXU and the City executed the Contract.  The City Council approved the Contract on April 26, 2000.  The Contract was deemed effective as of May 1, 2000.  (*See* Stipulated Facts at ¶13; Trial Ex. 544.)

50) The Contract provides that it may be executed simultaneously in two or more counterparts including facsimile signature, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  (Trial Ex. 544 at ¶30.)  At no time did any representative of any party to this lawsuit execute a complete copy of the Contract (including Exhibits A, B, and C).  (*See* Trial Ex. 588.)

51) In May 2001, the audit department and other City departments reevaluated the Contract for the purpose of appropriation of additional funds for the Contract. Hamilton informed the auditors that "The cost of natural gas is $4 to $5 per MMBtu.  This cost is wellhead cost, which does not include cost to transport gas through pipelines.  The gas is transported to the Detroit (MichCon) gate. Transportation cost[s] range from 15% to 30% of the natural gas cost."  Hamilton further advised that the Contract price for gas is reasonable and referred the auditor to the NYMEX listing to compare the Contract price to current gas prices. (*See* Trial Exs. 523; 524; 522 at 22:21-24:22, 34:6-12.)

52) Based in part on Hamilton's information, Joseph Harris, Auditor General for the City, recommended to the City Council that the City approve the amended

Contract. The City Council, for the second time, was not informed about the issue of TXU paying the MichCon transportation charges when it was considering the amendment. (*See* Trial Exs. 516, 518.)

53) The City and MichCon had numerous MichCon Contracts in place, whereby MichCon received TXU's gas at the MichCon Citygate and delivered the gas to the Facilities. (See Stipulated Facts at ¶17; *See* Trial Exs. 555, 556, and 565.)

54) The City paid all MichCon transportation costs for the first three years of the Contract term. (*See* Stipulated Facts at ¶27.)

55) Historically, the City had incurred large late charges and other fees from MichCon in connection with the MichCon Contracts. (*See* Stipulated Facts at ¶22.)

56) The City was renegotiating the MichCon Contracts at the same time it was negotiating the gas contract with TXU, and TXU was not involved in the negotiation process. TXU had no knowledge as to the content of these negotiations and the final transportation costs to the City resulting therefrom. (*See* Stipulated Facts at ¶23.)

57) In 2000, 2001, 2002, and 2003, the City negotiated transportation agreements with MichCon without involving TXU. (Trial Exs. 505, 508, 560, 563, 564, 582.) These agreements provided that the City would pay MichCon to transport gas delivered by TXU at the MichCon Citygate to the burner tip during periods running concurrent with the term of the Contract. (Trial Exs. 565, 555, 544.)

58) In February 2000, during the RFP process, Hamilton requested that Cascos provide him with a study that the City water department conducted a few months prior that analyzed the potential benefits of installing the City's own pipeline to transport gas to two of the City's largest Facilities (the "ByPass Study"). The purpose of the Bypass Study was to reduce transportation costs from the MichCon Citygate to the Facilities by bypassing the MichCon pipeline. Hamilton requested a copy of the Bypass Study for use in contemporaneous contract negotiations with MichCon concerning the MichCon contracts. (*See* Trial Exs. 504 at 56:12-57:18, 60:10-62:17, 63:15-19, 64:15-65:6, 66:4-9; 505; 506.)

59) The MichCon Contracts, approved by the City Council, provided for gas transportation costs from the MichCon Citygate to the Facilities to total approximately $0.54/mcf. For the duration of the five-year Contract, these costs totaled at least $20 million. (*See* Stipulated Facts at ¶¶19, 20, and 21.)

60) The City was the only party in privity with MichCon and their contracts did not afford any rights to or any obligations on non-parties. As such, neither TXU nor Seminole could benefit from any of the myriad of rights afforded to the City

pursuant to the MichCon Contracts, nor did the MichCon Contracts impute any of the City's obligations upon them.  (*See* Stipulated Facts at ¶18; Trial Exs. 555, 556, and 565.)

61) The City renegotiated and amended rate structures in the MichCon contracts without the involvement of TXU, reviewed various City department budgets out of concerns as to the City's ability to pay MichCon invoices, discussed late charges for MichCon invoices that it had continued to incur, and requested refunds and credits related to MichCon's transportation of gas to the Facilities and retained them for its own use and benefit.  (*See* Stipulated Facts at ¶¶24, 25, and 26; Trial Exs. 582, 529, 528, 563, 576, 526, 559, 552, 558, 561, 562, 525 at 112:3-115:22.)

62) In May 2003, Laurie Hohwart, an in-house attorney for the City who was not involved in the negotiations of the Contract, reviewed the Contract and determined that the City was paying MichCon transportation charges when, in her view, Exhibit "A" required that TXU pay such charges.  (*See* Stipulated Facts at ¶28; Trial Ex. 577.)

63) The City has placed into escrow and/or withheld payments to Seminole for gas delivered under the Contract in the amount of $6,994,343.85, which the City alleges is the amount of money it has improperly paid MichCon for transportation costs from April 2003 through March 2005.  (*See* Stipulated Facts at ¶30; Trial Ex. 587.)

64) The contract is governed by Michigan law.  (Trial Ex. 544 at ¶17.)

### B.  Conclusions of Law

1) At all times pertinent hereto, TXU intended that the "Delivery Point" under the Contract be the MichCon Citygate.

2) At all times pertinent hereto, the City intended that the "Delivery Point" under the Contract be the MichCon Citygate.

3) The reference on Exhibit "A" that the "Delivery Point" is "Each facility's meter(s) as attached in Exhibit 'C'" was the result of a mistake of the parties.

4) The final and agreed-upon provisions of the Contract are consistent and make sense if the "Delivery Point" is the MichCon Citygate.  Only Exhibit "A" presents a potential different interpretation, and such interpretation renders various provisions of the Contract inconsistent, conflicting and meaningless.  (*See* Trial Ex. 544.)

5) Based on the clear and convincing evidence presented, Exhibit "A" to the

       Contract must be reformed retroactively to the date of the execution of the Contract (as of April 20, 2000), to replace "Each facility's meter(s) as attached in Exhibit "C" with "MichCon Citygate."

6)    Defendants TXU and Seminole had no obligation to pay the MichCon transportation costs for the delivery of the gas to be supplied under the Contract from the MichCon Citygate to the Facilities.

7)    Defendants TXU and Seminole have not breached the Contract.

8)    The City has breached the Contract, as reformed, by improperly withholding payment in the amount of $6,994,343.85, as of March 31, 2005, from Seminole's gas invoices.

9)    Seminole is entitled to interest as set forth in the Payment Ordinance on the withheld payment in the amount of $633,294.53, as of March 31, 2005.

10)    The City must be ordered to make immediate payment of $6,994,343.85, plus interest in the amount of $633,294.53, as of March 31, 2005, to Seminole, and whatever additional withheld payments and interest beyond March 31, 2005, are calculated consistent with these findings and conclusions.

## VI.  CONCLUSION

IT IS ORDERED that the contract at issue is hereby REFORMED as explained herein.  Pursuant to its findings of fact and conclusions of law, the court enters judgment in favor of Defendants and against Plaintiff.

IT IS FURTHER ORDERED that Plaintiff's breach of contract claim is accordingly DISMISSED with prejudice, and that

Plaintiff's motion for summary judgment [Dkt. #19] is DENIED with prejudice.

IT IS FINALLY ORDERED that Defendants shall circulate a final judgment for approval as to form and present it to the court for review and entry on or before **September 27, 2005.**

                                                 S/Robert H. Cleland  
                                                 ROBERT H. CLELAND  
                                                 UNITED STATES DISTRICT JUDGE

Dated: September 21, 2005

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 21, 2005, by electronic and/or ordinary mail.

                                        S/Lisa Wagner
                                        Case Manager and Deputy Clerk
                                        (313) 234-5522